638 P.2d 278 (1981)
The PEOPLE of the State of Colorado, Petitioner-Appellee,
In the Interest of E.A., K.A., a/k/a A.A. and M.A., Children,
and Concerning, G.A., Respondent and S.A.O., Respondent-Appellant.
No. 80SA496.
Supreme Court of Colorado, En Banc.
December 14, 1981.
As Modified on Denial of Rehearing January 4, 1982.
*280 James M. Downey, Asst. County Atty., Boulder, for People and the Boulder County Dept. of Social Services, petitioner-appellee.
John P. Tracy, Guardian Ad Litem for M.A., Boulder, for petitioner-appellee.
Harriet Templer Moskovit, Boulder, for respondent-appellant.
Neil E. Piller, Longmont, for Foster Parents, intervenors.
QUINN, Justice.
This appeal is another phase of protracted litigation involving the termination of a parental relationship between a mother, S.A.O., and her eight year old son, M.A.[1] We addressed the pre-termination phase of this case in Overturf v. District Court of the Twentieth Judicial District, 198 Colo. 516, 602 P.2d 850 (1979), wherein we ordered the juvenile division of the district court to promptly resolve the question of termination of parental rights which had been pending since 1977. On December 21, 1979, the district court terminated the parent-child relationship and S.A.O. now appeals the decree of termination. Because the district court failed to apply the appropriate standards for termination of parental rights we reverse and remand.[2]

I.
The facts antedating the present phase of this controversy were outlined in Overturf v. District Court, supra, and we briefly summarize them here. In 1972 S.A.O. was experiencing financial and psychological problems and had separated from her husband. She was advised by Ms. Jan Pollman, a social worker with the Boulder County Social Services Department (department), to place her five year old son, E.A., and her two year old daughter, K.A., in a foster home. S.A.O. followed this advice and thereafter was required by the social worker to meet with her before each visitation with the children. Finding these sessions somewhat intimidating, S.A.O.'s visits with her children became less frequent.
On August 4, 1973, S.A.O. gave birth to a son, M.A. After being charged with and imprisoned for a bad check offense in July 1974, S.A.O. voluntarily placed M.A. with the department for foster care until her release from jail in November 1974. Upon her release the social worker informed her that she could visit M.A. if she wanted to work towards his return but refused to tell the mother where her child was.
On May 27, 1975, the department initiated a dependency proceeding based on S.A. O.'s failure to maintain contact with her children and her neglect of M.A. before placing him with the department in July 1974. The court on September 17, 1975, determined that the children had not received proper parental care, entered an adjudication *281 of dependency, and ordered that the children be retained in foster care pending a dispositional hearing. S.A.O., who was represented by counsel at the dependency hearing, was denied any visitation with her children until she was evaluated by a psychiatrist. The court's order remained effective until the latter part of 1978 with respect to E.A., the oldest child, and until mid-1979 in the case of K.A., the second child. The order denying visitation with M.A., the youngest child, remained in effect throughout the entire proceedings in this case.
In the early part of 1977 the department requested termination of the parental relationship between S.A.O. and G.A., the natural father, and their three children, E.A., K.A. and M.A. Termination of S.A.O.'s parental rights was sought primarily because she had failed to visit the children although, as noted previously, she had been denied visitation by the court order of September 17, 1975. The dispositional hearing was set on April 6, 1977, but was continued upon S.A.O.'s request until September 21, 1977. After the dispositional hearing the court took the matter under consideration. While the court had the matter under advisement S.A.O. remarried and in this intervening period she gave birth to a fourth child. In September 1979, when no decision yet had been made by the court on the issue of termination, S.A.O. commenced an original proceeding in this court. On November 13, 1979, we ordered the district court to promptly determine whether S.A.O.'s parental rights should be terminated. Overturf v. District Court, supra.
A second dispositional hearing was held before a different judge on December 14, 1979. The court reviewed the transcripts of prior hearings, received testimony from various witnesses, and considered psychiatric and psychological evaluations of S.A.O. and her children which had been made during the pendency of the dispositional hearing.[3] The court issued its decree on December 21, 1979. It found that the oldest child, E.A., had experienced significant improvement in his mental condition after having been placed in a residential treatment center in 1978 and returned E.A. to S.A.O. The middle child, K.A., was continued under foster care pending a visitation program calculated to reestablish the parent-child relationship. The court expressly noted that the condition which resulted in K.A.'s dependency no longer existed and the child's best interests would not be served by terminating S.A.O.'s parental rights, especially since all of the alternatives to termination had not been eliminated.
With respect to M.A., the eight year old son, the court made the following pertinent findings: although S.A.O. experienced severe emotional problems in the past and was generally unreliable, she has since reordered her life with a new marriage and the birth of a fourth child; S.A.O. never had the opportunity to develop a mother-son relationship with M.A. primarily as the result of the social worker's refusal to inform S.A.O. of her son's whereabouts and the court's previous mishandling of the case; S.A.O. was capable of functioning as a proper parent in a non-hostile environment and, with proper parental counseling, would be able to discharge her duties as a mother; M.A. requires special education and psychotherapy to overcome serious emotional problems stemming from repeated disruptions and separations in his early life; M.A. has lived with his current foster parents for two years and they desire to adopt him;[4] the initiation of a visitation program between S.A.O. and M.A. at this time would cause M.A. increased emotional problems and retard his intellectual and emotional development.
*282 Based on these findings the court terminated the parental relationship between M.A. and the boy's natural parents, S.A.O. and G.A.[5] The court acknowledged this court's decision in People in the Interest of M.M., 184 Colo. 298, 520 P.2d 128 (1974), which promulgated standards for termination of parental rights in cases such as this, but nevertheless declined to apply those standards because, as the court stated, "the result dictated would not be consistent with the overriding public policy of the Children's Code [which] can be achieved only by determining what disposition will best serve [M.A.]'s welfare and interests." The court concluded that "because of the conduct of the juvenile court and the department, [S.A.O.]'s parental rights have been effectively terminated" and "[u]nder no reasonable circumstances can the welfare of [M.A.] be served by a continuation of a parent-child relationship with [S.A.O.]." S.A.O. thereafter filed a motion to alter or amend the decree and upon its denial this appeal followed.
S.A.O. urges three principal arguments for reversal of the decree of termination. First, she asserts that there was insufficient evidence to support the 1975 dependency adjudication upon which the 1979 decree of termination was based. Second, she argues that she was never adequately notified of the factual basis for the termination proceeding in violation of due process of law. Last, she contends that the court failed to apply the appropriate legal standard for termination of her parental relationship with M.A. We agree with her last contention and reverse the judgment and remand the case for a resolution of the department's petition for termination in accordance with the appropriate legal standard.

II.
Before considering S.A.O.'s arguments relating to the decree of termination, we address a preliminary matter of procedure raised by the department, the guardian ad litem for M.A., and the intervening foster parents of M.A., namely that S.A.O.'s failure to file a motion for a new trial after the 1975 dependency adjudication and to appeal therefrom precludes her from challenging the dependency adjudication at this time.
An appeal lies from any final judgment entered by a juvenile court. C.A.R. 1(a)(1). A final judgment is "one which ends the particular action in which it is entered, leaving nothing further for the court pronouncing it to do in order to completely determine the rights of the parties involved in the proceedings." D.H. v. People, 192 Colo. 542, 561 P.2d 5 (1977), quoting Stillings v. Davis, 158 Colo. 308, 310, 406 P.2d 337, 338 (1965). The Children's Code permits the court to bifurcate the adjudicatory and dispositional hearings and to continue the dispositional hearing to some future date. See People in the Interest of M.B., 188 Colo. 370, 535 P.2d 192 (1975); sections 19-3-106(3) and (6)(b), C.R.S.1973 (1978 Repl.Vol. 8). The adjudication of a child as dependent or neglected, with the dispositional hearing continued to a future date, does not become a final judgment until a decree of disposition is entered. People in the Interest of F.M., Colo.App., 609 P.2d 1123 (1980); People in the Interest of B.W., Colo.App., 601 P.2d 1086 (1979). The time for filing a motion for a new trial or for a modification of judgment does not commence to run until the entry of a final order, judgment or decree. People in the Interest of F.M., supra; C.R.C.P. 59(b) and 59(e).
Since S.A.O. could not have appealed the 1975 dependency adjudication until the entry of a decree of disposition, her present challenge to the dependency adjudication is not untimely. S.A.O. timely filed a motion for a modification of the decree of termination entered on December 21, 1979. Included in S.A.O.'s motion was her claim regarding the insufficiency of evidence to support the dependency adjudication in 1975. S.A.O.'s notice of appeal likewise was timely filed. Therefore, her appellate claim relating to the sufficiency of evidence to support the dependency adjudication in September 1975 is properly before this court.

*283 III.
We now turn to S.A.O.'s three arguments relating to the decree of termination: the alleged insufficiency of evidence to support the September 1975 dependency adjudication, the claimed inadequacy of notice as to the prospective termination, and lastly the challenged legal standard applied by the court in terminating the parent-child relationship.

A.
S.A.O. asserts that because the department's social worker refused to allow her to visit M.A. or to inform her of his whereabouts, there was insufficient evidence to support the September 1975 dependency adjudication. We disagree.
The definition of a "dependent or neglected child" includes, inter alia, a child who lacks proper parental care through the acts or omissions of the parent, section 19-1-103(20)(b), C.R.S.1973 (1978 Repl.Vol. 8), or a child whose parent refuses to provide care necessary for the child's health, guidance or well-being, section 19-1-102(20)(d), C.R.S.1973 (1978 Repl.Vol. 8). An adjudicatory hearing on dependency or neglect is designed to determine whether the child, for whatever reason, lacks "the benefit of parental guidance, concern, protection or support to which he is entitled." People in the Interest of S.S.T., 38 Colo.App. 110, 117, 553 P.2d 82, 89 (1976); see also People in the Interest of D.A.K., 198 Colo. 11, 596 P.2d 747 (1979), appeal dismissed sub nom. J.K.S. v. Colorado, 444 U.S. 987, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979).
In this case there was evidence establishing that S.A.O. contributed to the child's dependency by her chronic failure to keep appointments with the social worker and by her general instability and parental indifference during the year immediately preceding the dependency adjudication in September 1975. Moreover, there was testimony establishing that the child had not received proper parental care while in S.A. O.'s custody during the first eleven months of his life.[6] The evidence is sufficient to support the dependency adjudication and we will not disturb it on appeal.

B.
S.A.O. asserts that she was denied due process of law because she was not given adequate notice of the conduct which allegedly warranted termination of her parental rights. While a parent must be given adequate notice of the possibility of termination of parental rights and also be afforded an opportunity to be heard on that issue, Johnson v. People, 170 Colo. 137, 459 P.2d 579 (1969), the record in this case establishes that S.A.O. was accorded due process of law.
The dependency petition filed in May 1975 alleged in factual detail S.A.O.'s lack of parental care for M.A. and her failure to communicate with him. S.A.O. was informed in the petition that termination of her parental rights was a possibility. The court appointed an attorney for her at the outset of the dependency proceeding, section 19-1-106(1)(b), C.R.S.1973 (1978 Repl. Vol. 8), and S.A.O. had the assistance of counsel at both the adjudicatory and dispositional phases of the case. It was clear to all interested parties that the dependency adjudication in September 1975 could result in termination of parental rights at a subsequent dispositional hearing. In fact, S.A. O.'s attorney moved for a continuance of the dispositional hearing originally scheduled in April 1977 for the specific reason that S.A.O.'s parental rights were at stake and she needed more time to prepare for the hearing. S.A.O. also had access to the psychological and psychiatric reports upon which the department relied in the termination proceeding. In view of these facts, her claim of inadequate notice lacks merit. See People in the Interest of H. A. C., 198 Colo. 260, 599 P.2d 881 (1979), cert. denied sub *284 nom. D. C. C. v. Colorado, 444 U.S. 1022, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980).

C.
In terminating the parent-child relationship the court believed it was impossible to apply the legal standard for termination enunciated by this court in People in the Interest of M. M., 184 Colo. 298, 520 P.2d 128 (1974), because the application of this standard would be inconsistent with securing for the child such care and guidance as will best serve his welfare. We conclude that the court's departure from our decision in People in the Interest of M. M., supra, requires a reversal of the order of termination and a remand for reconsideration in accordance with the appropriate standard for termination.
The petition alleging M.A.'s dependency and neglect was filed on May 27, 1975. At that time section 19-3-111(2)(a), C.R.S. 1973, permitted termination of parental rights after a child had been adjudicated dependent and neglected "when . . . [the court] finds that the best interests and welfare of the child shall require." People in the Interest of H. A. C., supra, 198 Colo. at 263, 599 P.2d at 884 (1979). In People in the Interest of M. M., supra, we adopted the standard for termination formulated by the Court of Appeals in People in the Interest of K. S. and M. S., 33 Colo.App. 72, 515 P.2d 130 (1973), and applied this standard to all dependency proceedings commenced prior to July 1, 1977.[7] This standard, which has been reaffirmed in subsequent cases, requires that the following conditions be satisfied before parental rights are terminated: (1) evidence of severe and continuous neglect by the parent whose rights are sought to be terminated; (2) a finding of a substantial probability of future deprivation to the child; (3) a determination that under no reasonable circumstances can the welfare of the child be served by a continuation of the parental relationship; and (4) a consideration of less drastic alternatives and a specific elimination of these alternatives prior to termination. People in the Interest of C. S., Colo., 613 P.2d 1304 (1980); People in the Interest of H. A. C., supra; People in the Interest of M. B., supra.
*285 Adherence to this standard for termination is not inconsistent with the welfare of the child. On the contrary, this court acknowledged in People in the Interest of M. M., supra, that the welfare of the child is the primary and controlling consideration in a termination proceeding. This is not to say, however, that the child's welfare is the only consideration. Nor does it imply that the child's welfare and the parents' interest in maintaining the parental relationship are in irreconcilable conflict.
The parent-child relationship finds protection in both the due process and equal protection clauses of the Fourteenth Amendment, Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Overturf v. District Court, supra, and parents have a fundamental interest in maintaining this legal relationship with their natural children. Termination of the parent-child relationship divests the parent and the child of all legal rights and obligations with respect to each other. For this reason the power of the state to sever parental ties should be exercised with extreme caution. People in the Interest of K. S. and M. S., supra. A child's care and guidance preferably should be administered by his natural parents and the parental relationship should not be terminated simply because the child's condition thereby might be improved. See People in the Interest of J. M. and C. M., 198 Colo. 436, 601 P.2d 1364 (1979); People in the Interest of S. S. T., 38 Colo.App. 110, 553 P.2d 82 (1976). The requirements for termination outlined in People in the Interest of M. M., supra, and subsequent cases, e.g., People in the Interest of C. S., are designed to effectuate the child's welfare and, at the same time, to accord due consideration to the important interests of the natural parents. These decisions contemplate that the court should order termination only when the four specific requirements for termination have been satisfied.
In this case the court focused on the interest of the child and considered less drastic alternatives to termination but did not resolve two other issues essential to a decree of termination. First, the court did not determine whether S.A.O.'s prior conduct constituted a form of severe and continuous neglect that warranted termination of her parental rights. The court attributed much of the mother's lack of contact with her child to the department's adversary attitude and the court order of September 1975 denying her visitation, as evidenced by the following remarks in the termination decree:
"An objective analysis of the evidence and data in this case will lead any reasonable person to but one conclusion: the Department failed to discharge all of its responsibilities in this difficult case. The courts must likewise share the responsibility for the mishandling of this sensitive matter. Ms. Pollman, as the principal case worker, early on took an adversary position that the respondent's parental rights should be terminated. Rather than attempting to reintegrate the children into the family or even trying to help in establishing a parental relationship between the respondents and their children, Ms. Pollman viewed her role as an investigator whose job it was to gather evidence to support her position."
On rehearing of this matter the court must determine whether, under the totality of circumstances, S.A.O.'s conduct towards M.A. during the extensive time frame involved in these proceedings constituted such a severe and continuous neglect of the child as to justify termination of her parental rights.
The second critical issue which the court failed to resolve is whether there is a substantial probability of future deprivation to M.A. in the event the parent-child relationship is not terminated. The court alluded to the mother's severe emotional problems in the past and her general unreliability in keeping appointments with the social worker concerning the child. However, after noting S.A.O.'s remarriage and the recent birth of a fourth child into a positive family environment, the court found that the condition which resulted in M.A.'s dependency and neglect no longer existed and that S.A.O. would be able to *286 discharge her parental responsibilities with the assistance of psychotherapy and parental counseling. The court's findings in this respect appear to be directed to S.A.O.'s general parental ability and not specifically to her ability to function as a parent towards M.A. S.A.O.'s remarriage and ability to care for her other children are not conclusive on the issue whether, considering her emotional problems in the past and parental deficiencies toward M.A., there is a likelihood of future deprivations of parental care and guidance toward M.A.
So that there will be no confusion on remand, we take this opportunity to elaborate upon what is meant by a substantial probability of future deprivation in the context of this case. In determining whether the condition which resulted in the finding of dependency or neglect in all probability will continue, the court must focus on S.A.O.'s parental relationship and ability toward M.A. as manifested by the impact of her psychological, emotional and other characteristics on the needs and welfare of this child. While S.A.O.'s reordering of her life and her enhanced parental capacity in relation to her other children are relevant to the issue of the substantial probability of future deprivation, they are not, by themselves, conclusive on that issue. What is significant is whether the underlying instability and attitude of S.A.O. toward M.A. has significantly changed to the point of enabling her to provide a stable and affectionate environment for this particular child.
The parent-child relationship in this case may be terminated only if: (1) there is evidence of severe and continuous neglect by S.A.O.; (2) the court finds there is a substantial probability of future deprivation to M.A.; (3) the court determines that under no reasonable circumstances can the welfare of M.A. be served by continuation of the parental relationship; and (4) the court considers and specifically eliminates less drastic alternatives to termination. Upon remand the court in its discretion may receive additional evidence on the issue of termination or may dispense with additional evidence and make new findings on the basis of the record previously made.
The judgment is reversed and the cause is remanded to the district court for further proceedings consistent with the views herein expressed.
NOTES
[1] This appeal was originally filed in the Court of Appeals but was transferred to this court pursuant to section 13-4-110, C.R.S.1973, because of constitutional issues raised by S.A.O.
[2] Our reversal and remand renders it unnecessary for us to consider S.A.O.'s constitutional challenges to the order of termination as violative of due process and equal protection of the laws under the Fourteenth Amendment to the United States Constitution. We also need not and do not consider her argument that the trial court gave excessive weight to the testimony of one of the psychiatrists who evaluated M.A.
[3] Two psychiatrists had examined S.A.O. prior to the first dispositional hearing on September 21, 1977. A psychiatric social worker also had examined S.A.O. and the children prior to the September 1977 hearing. One other psychiatrist had examined the child, M.A., in May 1979 in connection with S.A.O.'s motion for visitation which was denied.
[4] The foster parents were permitted to intervene in the termination proceeding as interested parties. See People in the Interest of M.D. C.M., 34 Colo.App. 91, 522 P.2d 1234 (1974).
[5] The natural father, G.A., has chosen not to appeal the decree of termination.
[6] A babysitter provided evidence that on several occasions when S.A.O. delivered M.A. to her for babysitting, the child's clothes were dirty and the milk in the baby's bottle had curdled. Also, the babysitter testified that S.A.O. did not change the child's diapers as required and as a result the child developed a severe rash and bleeding sores on his bottom.
[7] The following statutory criteria, which are set out in section 19-11-105, C.R.S.1973 (1978 Repl.Vol. 8), apply to orders of termination in connection with dependency or neglect petitions filed on or after July 1, 1977:

"(1) The court may order a termination of the parent-child legal relationship upon the finding of ... the following:
* * * * * *
(b) That the child is adjudicated dependent or neglected and all of the following exist:
(I) That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful;
(II) That the parent is unfit;
(III) That the conduct or condition of the parent or parents is unlikely to change within a reasonable time.
"(2) In determining unfitness, conduct, or condition, the court shall find that continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or that the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care. In making such determinations, the court shall consider, but not be limited to, the following:
(a) Emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental, and emotional needs of the child;
(b) Conduct towards the child of a physically or sexually abusive nature;
(c) History of violent behavior;
(d) A single incident of life-threatening or gravely disabling injury or disfigurement of the child;
(e) Excessive use of intoxicating liquors or narcotic or dangerous drugs which affect the ability to care and provide for the child;
(f) Neglect of the child;
(g) Long-term confinement of the parent;
(h) Injury or death of a sibling due to proven parental abuse or neglect;
(i) Reasonable efforts by child-caring agencies which have been unable to rehabilitate the parent or parents.
"(3) In considering any of the factors in subsection (2) of this section in terminating the parent-child legal relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and order, if necessary, an evaluation of the child's physical, mental, and emotional conditions."